(49 South. 162.)

No. 17,519.

STATE v. GRUNEWALD.

In re ADAMS, Dist. Atty.

(March 29, 1909.   Rehearing Denied April 26, 1909.)

INTOXICATING LIQUORS (§ 45*)—PERMITS—RETROACTIVE LEGISLATION.

Whether the language of section 8, Act No. 176, p. 240, of 1908, be taken literally or construed with reference to circumstances and to canons of construction throwing light upon the intent, the conclusion reached is that the requirement with reference to the obtention of "permits" for the opening or conducting of barrooms has no application to persons by whom "permits" had been obtained under the pre-existing law, and who had established themselves at places authorized thereby before the passage of the act in question.

[Ed. Note.—For other cases, see Intoxicating Liquors, Cent. Dig. § 47; Dec. Dig. § 45.*]

Land, J., dissenting.

(Syllabus by the Court.)

Theodore Grunewald was charged with conducting a barroom without having obtained a permit and within 300 feet of a church or school. Defendant demurred, and, his demurrer having been sustained, St. Clair Adams, District Attorney, applies for writs of certiorari, prohibition, and mandamus. Prosecution dismissed.

Walter Guion, Atty. Gen., St. Clair Adams, Dist. Atty., and Warren Doyle, Asst. Dist. Atty. (Ruffin Golson Pleasant, of counsel), for relator.   John Patrick Sullivan, Samuel Louis Gilmore, Adams & Otero, and Dinkelspiel, Hart & Davey, for respondent Grunewald.   Respondent judge, pro se.

Statement of the Case.

MONROE, J.   Defendant, as president of the Grunewald Hotel Company, is charged with having violated section 8, Act No. 176, p. 240, of 1908, by conducting a barroom on January 1, 1909, without having obtained a permit therefor, and at the same time and place with having conducted a barroom "within 300 feet of a church or school, measured both by the ordinary walking distance between such barroom and such church or school, or measured in an air line from the nearest point of the building in which said barroom is conducted to the nearest point in the building occupied by such church or school."   In a bill of particulars, furnished at defendant's request, it is explained, with reference to the charge first stated, that:

"It is not intended to charge that he [defendant] did not, before that, obtain from the city council * * * a permit to conduct a barroom * * * under the previously existing statutes, but that it is charged that the said permit or privilege heretofore obtained became null and void and of no effect on the 31st day of December, 1909."

To the charge so made defendant demurred, on the grounds that it sets forth no offense known to the law, that it wrongfully attributes to the statute relied on a retroactive operation, and that the statute is unconstitutional, in so far as it undertakes to abridge the privileges and immunities of the citizens of the United States and of this state, and to deprive defendant of his liberty and property without due process of law, and to deny him the equal protection of law. This demurrer having been sustained on the second ground (as above stated), the district attorney presented to this court the application which we are now to consider, alleging that the opinion and judgment of the trial judge are contrary to law and to established

jurisprudence; that it is not intended to charge the defendant with the violation of any retroactive or ex post facto law, and was not intended to charge the defendant with the commission or omission of any act committed or omitted, either before the passing of Act No. 176, p. 236, of 1908, or before the date upon which it became operative; that on the contrary, said information charges the defendant with the commission of an offense on the 1st day of January, 1909, a date subsequent to the time at which "Act No. 176 of 1908 became operative."

## Opinion.

We take it to be conceded, by the bill of particulars furnished by the state and by the trend of the argument, that prior to the passage of Act No. 176, p. 236, of 1908, the defendant had obtained a permit from the city council to operate a barroom at the place where he is now established, and the question here presented is whether, by reason of the act in question, the permit so obtained (as the bill of particulars charges) "became null and void and of no effect on the 31st day of December, 1908," and whether defendant was thereby placed under the obligation to obtain a permit in accordance with the provisions of the act mentioned. The previous legislation on the subject indicates that the matter of granting permits to keep barrooms has been regarded, at least since 1896, as one requiring serious consideration, and not to be acted on without taking into account the wishes of the owners of property in the neighborhoods where it was proposed to establish them, and the idea seems to have been accepted that, when an applicant for such permit once obtained the consent of the property owners and satisfied the city council of his fitness to receive it, he would not be required to go through the same process year after year, but that the concession would hold good until, for reasons

satisfactory to it, the city council should recall it.

The city charter of 1896 (Act No. 45, p. 55, of 1896, § 21) prohibited the council from granting any permit, save upon the written consent of a majority of the householders or property owners, within 300 feet "measured along the street front," and required it to revoke any permit granted upon the petition of the like number of such persons; and we are informed, through the briefs which have been filed, as also through the litigation which has from time to time been brought into this court, that the city council thereafter adopted various ordinances in accordance with the language and the spirit of its charter—one (in 1897) to the effect that thereafter no permit would be granted to operate a barroom within 300 feet of a church or school, and another (in 1898) reading as follows:

"Resolved, that it is the sense of the council that, in all cases where a building has been constantly occupied as a barroom and has not changed its identity since the time that it was so occupied, it shall not be necessary for any person or persons who may desire to establish a barroom in such building to obtain a permit from the council in accordance with the existing laws and ordinances: Provided that there shall be no protest filed with the council, in the meanwhile, against the reopening and operating of a barroom in said building."

By Act No. 99, p. 224, of 1904, section 21 of the city charter was amended and re-enacted so as to read:

"The council shall not grant any privilege for the opening of any barroom, * * * except upon the written consent of a majority of the bona fide property owners, or their agents, within 300 feet, measured along the street fronts, of the proposed location of such barroom; * * * provided, that the council shall have power and authority to refuse to grant any such privilege, even when accompanied by the written consent of property owners, or their agents aforesaid, whenever the council shall deem such refusal advisable. The council shall revoke any privilege, on the petition of a like number of such persons; any prior license or privilege to the contrary notwithstanding. The council shall not grant any privilege for the opening of any barroom * * * within 300 feet of any church or of any school where children are taught."

It can readily be imagined that, in view of the legislation thus referred to, and of the fact that, otherwise than as stated, the General Assembly had not undertaken to exercise the power, vested in it by the Constitution, to regulate the sale of alcoholic liquors, many citizens of a metropolis such as New Orleans, having a large population and visited by thousands of people from all parts of the world, have invested their money (in some instances, no doubt, the earnings of their lives) upon their faith in the continuance of existing conditions, and the intention of the General Assembly to disturb those conditions and to destroy the values dependent on them should not be too hastily presumed. The title of the statute which is said to accomplish that result reads, in part:

"An act to regulate and license the business of conducting a barroom, * * * and to provide penalties for the violation of this act; to limit the effect and operation of this act to cities, towns, villages and parishes * * * where the sale of liquor is permitted. * * * *"

The text of the statute provides, in substance, as follows, to wit:

Section 1: Hereafter state licenses for barrooms shall be based on the annual gross receipts; sellers of wine and beer to pay one-half the rates charged to general retail dealers in liquors, but no license to issue for less than $200.

Section 2: City and town authorities shall impose licenses of not less than $500, subject to the exception provided in section 1.

Section 3: No one shall conduct a barroom without taking out a license, under penalty of fine, or imprisonment, or both.

Section 4 provides that hereafter barrooms, conducted in connection with groceries, shall be separated from them by partitions, and that the entrance to the barroom shall be from the street.

Section 5 prohibits the issuance of a barroom license to a woman, girl, or minor, and prohibits women, girls, and minors from serving in such places.

Section 6 makes it unlawful to sell liquor to women, girls, or minors, or to set apart places in which they may drink; an exception being made with respect to hotels, boarding houses, and restaurants, where wine or liquor is served with food. This section also makes it unlawful to permit, in the same building, the sale, for consumption on the place, of liquor to whites and negroes.

Section 7 imposes an additional penalty on persons violating the provisions of section 6, or permitting games prohibited by law in their licensed barrooms, or renting their places for such purposes.

"Sec. 9. * * * That any person who has been previously convicted by the courts of this or any other state of felony shall be incompetent to hold, or obtain, a license as a retail liquor dealer. * * * *"

Section 10 makes it unlawful to have music, games, or entertainments in barrooms, save in open-air places, where meals are served, and prohibits the exhibition or keeping of vulgar pictures or books in barrooms.

Section 11 makes it unlawful for any brewing company, or officer of such company, to obtain a barroom license, or to be interested in a barroom or in the lease of premises used for barroom purposes.

Section 12 authorizes city, town, and village authorities to restrict the limits within which liquors may be sold.

Section 13 makes provision for the collection of the licenses and imposes a penalty for false affidavits.

Section 14 limits the application of the statute to places where the sale of liquors is permitted.

Section 15 repeals inconsistent laws.

Section 16 provides that the act shall "take effect from and after December 31, 1908."

It will be observed that, in the main, the provisions of the act thus quoted do not

touch the question whether persons who had already complied with the law in the matter of obtaining permission to engage in the barroom business at particular places, and had, perhaps, purchased the property, or leased it for years, with that view, are required to do anything more in order to entitle them to remain where they are (subject, always, to the action of the city council, as provided by the act of 1904) than to obtain their licenses. We come, then, to section 8, upon which the state relies, and which reads:

"Sec. 8. * * * That any person *desiring* to conduct a barroom * * * and desiring a license to conduct such business, in any locality within this state, prior to the issuance to him of any license, by either state, town, parish, or municipal authorities, shall, where such barroom * * * *is to be located* in any incorporated city, * * * address a sworn petition to the city council, * * * and, in cases where such barroom * * * *is to be located* * * * outside the limits of incorporated cities or towns, shall address a petition to the police jury of the parish, * * * which shall state the location of the place * * * in which *it is intended* that such establishment shall be conducted, the name and place of residence of the person * * * applying for the license, or, if the applicant is a firm or corporation, the style of the firm, or the name of the corporation, and the names and places of residence of the individual members of the firm or the officers and stockholders of such corporation, as the case may be, and shall contain allegations that such person or persons, or officers or stockholders in such corporations, are citizens of the state of Louisiana, law-abiding and of good moral character, and that such person, firm, or corporation, or any member, officer, or stockholder thereof, is not disqualified, under the provisions of this act regulating and affecting the sale of intoxicating liquors, from engaging in said business. This petition must be accompanied by an affidavit of two reputable citizens of this state, domiciled at the place where such applicant *desires to locate his establishment*, vouching for the truth of all the allegations contained in the applicant's petition as hereinabove specified. Notice of the filing of this petition, setting forth the names of the applicant [and] the *place where he intends to locate* his establishment, shall be published during ten days in a daily newspaper published at *the place where said establishment is intended to be located*, or, if there is no daily newspaper at said place, in that case, said notice shall be published three times in a weekly newspaper, and, after said publication, said city councils, or boards of aldermen, or police juries, shall proceed to pass upon said application. The ordinances of the city councils or boards of aldermen or the resolutions of the police juries, granting applicant such permission, shall be applicant's warrant for obtaining a license from the state, parish, municipal, or town authorities, after paying for the license according to the classification contained in this act. If, however, an opposition is filed to an applicant's petition, the city councils or boards of aldermen or police juries shall hear the parties, contradictorily and in a summary manner and with as little delay as possible, and dispose of the matter accordingly.

"No council or board of aldermen of any incorporated city or town of this state shall grant any privilege *for the opening* of any barroom, * * * except upon the written consent of a majority of the *bona fide* property owners, or their agents, within 300 feet, measured along the street front, of the *proposed location* of such barroom; * * * provided, that the council or board of aldermen shall have power and authority to refuse to grant any such privilege, even when accompanied by the written consent of the property owners or their agents, aforesaid, whenever the council or board of aldermen shall deem such refusal advisable.

"The council or board of aldermen shall revoke any privilege on the petition of a like number of persons, any prior privilege to the contrary notwithstanding.

"No council or board of aldermen or police jury shall grant any privilege for the opening of any barroom * * * within three hundred feet of any church or of any school where children are taught.

"Any person, firm or corporation, hereafter conducting any barroom, * * * who shall conduct such place without the permit or privilege required by this section, or who shall violate any of the provisions of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined, * * * and shall, upon a second conviction, * * * be permanently deprived, thereafter, of the privilege of conducting a barroom."

The "permit" is thus made the basis, or "warrant," for the issuance of a license; but whilst, under other provisions of the act, a new *license* must be obtained for each succeeding year, we do not understand the law to mean that a person who has once satisfied the authorities and his neighbors that he may safely be permitted to engage in the barroom business is expected, year after year, to go through the same process of presenting a sworn petition, obtaining indorsements, and inviting opposition and criticism, through publication in the newspapers, in order to renew his *permit;* and,

if one who obtains a permit under the act of 1908 is not required to renew it annually, there is no reason that occurs to us why one who had obtained a permit, by complying with pre-existing laws, should be required to do so. Considering the language of the different paragraphs of the section last above quoted, the impression, created by the use of the words and expressions which we have italicised, is that the lawmaker had in view the establishment of barrooms by persons whose fitness had not already been tested, or at places where none had before been established. Thus, the "person" referred to is one *"desiring to conduct a barroom,"* who *"desires to locate his establishment."* The barroom is a thing *"to be located,"* and the situs is the place *"in which it is intended that such establishment shall be conducted," "the place where he* [the applicant for the permit] *intends to locate his establishment," "the place where said establishment is intended to be located."*

The first paragraph of the section is, however, hardly applicable to New Orleans, since it requires the petition to be accompanied by the affidavits of two reputable citizens "domiciled at the place where such applicant desires to locate his establishment," and such citizens might be domiciled in this city and yet live 30 miles away from the site of the proposed barroom. We find, therefore, that the second paragraph relates exclusively to cities and towns, and we further find, in considering the language used in the second paragraph, that the impression to which we have referred becomes a conviction, in so far at least as the intention with respect to cities and towns is concerned. Thus, the paragraph reads (in part):

"No council * * * of any incorporated city * * * shall grant any privilege for the *opening* of any barroom * * * except upon the written consent of a majority of the *bona fide* property owners, or their agents, within 300 feet, measured along the street fronts, of the *proposed location* of such barroom; * * * provided, that the council * * * shall have power and authority to refuse to grant any such privilege, even when accompanied by the written consent of the property owners, or their agents, aforesaid, whenever the council shall deem such refusal advisable. The council * * * shall revoke any privilege, on the petition of a like number of persons, any prior privilege to the contrary notwithstanding."

The lawmakers, of course, knew the difference between a permit for the *"opening"* of a barroom at some *"proposed location"* and a permit for the operation of an established barroom at some location already ascertained and approved. In fact, the paragraph that we are now considering is, practically, a reproduction of section 21 of the New Orleans city charter (Act No. 45 of 1896) as amended by Act No. 99 of 1904, under which the city council had, long before, adopted ordinances laying down the rule that a permit, once granted, remains good until revoked or until the premises upon which the barroom was established loses its "identity." That the members of the General Assembly were fully advised that such action had been taken and that the existing law (thus re-enacted by them), requiring permits to be obtained as warrants for the issuance of licenses, had been interpreted as inapplicable to persons to whom permits had already been issued, cannot reasonably be doubted, since the city of New Orleans had its representatives in the General Assembly, the question was one of vital importance to a large number of their constituents, and it is not to be supposed that they were in ignorance of what was being done, or that they allowed their fellow members to act in ignorance of the situation. If it had been the intention to take so radical a step as to require that a new permit should be obtained, as the licenses are required to be obtained, at the beginning of each succeeding year, and at the same time to prohibit the issuance of permits to barrooms within 300 feet of churches and schools,

thus by indirection excluding many hotels, social clubs, and barrooms which have been established in the heart of the business part of the city, and which have been maintained, without complaint, for generations, within the recently proscribed distance from some school or church, about which the city has gradually grown up, we apprehend that the General Assembly would, in common fairness, have so declared, in unmistakable terms, since the law, under that interpretation, acquires an effect which is certainly retroactive, and possibly disastrous, as to those who, having long ago obtained permits to conduct their establishments at particular places, have believed themselves to be reasonably secure, and have regulated their business and worldly affairs accordingly. The following excerpt sufficiently expresses the general view in regard to retroactive or retrospective legislation, to wit:

"*Retrospective* Laws. Such statutes when not forbidden by the Constitution, may be valid; but there is always a strong leaning against giving them a retrospective operation, and this proceeds from the presumption that the Legislature does not intend what is unjust. 'Those whose duty it is,' says Erle, J., 'to administer the law, very properly guard against giving to an act of Parliament a retrospective operation, unless the intention of the Legislature that it should be so construed is expressed in clear, plain and unambiguous language.'
"Such laws are looked upon with general disfavor. In Dash v. Van Kleeck, 7 Johns. (N. Y.) 506, 5 Am. Dec. 291, Kent, J., said: 'There has not been, perhaps, a distinguished jurist, or elementary writer, within the last two centuries, who has not had occasion to take notice of retrospective laws, either civil or criminal, but has mentioned them with caution, distrust, or disapprobation.'" Sutherland on Statutory Construction, 406 (cited in Cassard v. Tracy, 52 La. Ann. 840, 27 South. 368, 49 L. R. A. 272).

The third paragraph of the statute now under consideration is couched in the same cautious language as the second. Instead of saying (if such had been the intention):

"No council shall grant any privileges for the opening of any barroom, *or for the maintenance or operation* of any barroom, in any hotel, private social club, or otherwise, within 300 feet of any church"—

the paragraph reads:

"No council shall grant any privilege for the *opening* of any barroom * * * within 300 feet of any church."

Whether, therefore, we take the language of the statute, so far considered, literally, or whether we construe it with reference to the circumstances and the principles of construction, to which we have referred as throwing light upon the intent, we reach the conclusion that the requirements with reference to the obtention of permits has no application to persons by whom permits had been obtained, and who had established themselves at the places authorized by such permits, before the statute was adopted.

The fourth paragraph of section 8 ("any person * * * conducting any barroom * * * who shall conduct such place without the permit * * * required by this section * * * shall be deemed guilty of a misdemeanor," etc.), when construed with those which precede it, can only be held to apply to those persons who are required to obtain permits. In other words, the meaning, as we take it, may be expressed in this way:

"Any person conducting a barroom, who shall conduct such place without the permit required *of him* by this section, shall be deemed guilty," etc.

But the defendant now before the court, having obtained his permit before the passage of the act of 1908, is not one of the persons of whom, under section 8 of that act, a permit is required.

We may say, in this connection, and in conclusion, that the facts upon which the defendant's demurrer is predicated have, to some extent, been taken for granted, because they appear to have been practically conceded by the bill of particulars furnished by the state, and have been assumed as the basis of the argument presented by the learned Attorney General and the district attor-

ney, as also of that presented by counsel for the defendant.

The matter appears to have been so dealt with in the district court, and it was upon that basis, as we assume, that the trial judge founded his judgment, which we find to be correct.

It is therefore ordered, adjudged, and decreed that the preliminary order herein made be recalled and rescinded, and this proceeding dismissed.

See dissenting opinion of LAND, J., 49 South. 166.